The next case on our docket is Cheryl Sauer v. Solar Edge Technologies, Inc. And that case has been submitted on the briefs. So that brings us to the next argument case today, and that's John Arnold v. Michael Johnson v. Michael Mittman. The lawyers can please come forward. Do you need her? So when you're ready, you may come forward. May it please the Court, my name is Mark Wilson, and I represent the appellants, John Arnold and Michael Johnson, and I would like to reserve three minutes, please. The parties in this case were the three musketeers for many years until Mr. Mittman filed his own whistleblower application. Mr. Mittman breached the party's agreement that Mr. Johnson would file a single whistleblower application for the Johnson Group, and the Johnson Group included all three of those parties. The parties agreed that if the SEC awarded a bounty, then they would split that bounty and the associated expenses in accordance with a formula. Mr. Mittman's breach netted him $13.5 million, when he was only entitled to $1.1 million under the party's agreement. And the District Court's order leaves my clients without a remedy to recover over $12 million of damages. We are asking this Court to reverse the District Court's order denying my clients leave to amend with instructions to permit my clients to file a second amended complaint. Our preference is that the Court reverse with instructions for the case to proceed on the first amended complaint as drafted. Now my clients pled all the potential claims that the facts justified, and they expected that discovery would reveal the best causes of action that they would present to the jury. They didn't expect that the District Court would grant a motion to dismiss with prejudice, without leave to amend. Especially because this was the first time that the Court heard a motion to dismiss on its merits. The first time the Court heard the motion to dismiss, it granted it on the basis of ripeness. So when the District Court decided the motion at issue, it should have at least given my clients a chance to amend. Now the District Court decided the merits of the case under the guise of the plausibility standard. But my clients don't have to prove their case in the complaint. But that's the filter that the District Court used when it evaluated the first amended complaint. The first amended complaint adequately put Mr. Mittman on notice of the claims. There is enough factual content in the first amended complaint for the Court to draw a reasonable inference that Mr. Mittman is liable for the alleged claims. Now the District Court's error is best exemplified by looking at the claims for breach of oral contract, breach of implied in fact contract, and concealment. Now with respect to the oral contract claim, the trial court granted the motion to dismiss because my clients did not allege an oral contract in the original complaint and they failed to specify the date and the context of the agreement in the first amended complaint. Now the original complaint did have a cause of action for breach of contract. And my client, when they filed an amended complaint, broke that original contract claim into two pieces, an oral contract claim and the implied in fact contract claim. This is a notice pleading requirement. There's no surprises here. And the conclusion that the District Court made that if there was an oral contract that would have been included in the original contract is a merits argument, not a plausibility argument. There's no cases that say the failure to specify the exact legal theory in an original complaint bars an amended complaint.  Your position that there could not have been a surprise might be a bit of a stretch given the earlier action in the D.C. Circuit, D.C. District Court and D.C. Circuit Court. There was a different argument there that may or may not have been given the basis for a collateral estoppel or even a judicial estoppel type claim, but we don't have those claims here to be sure. But I think there there was an argument by your client that there hadn't been a joint venture, right? The joint venture claim here could have been a surprise. So the concept of joint venture or joint whistleblower was a very different concept at the D.C. Circuit Court of Appeals and the SEC than it was here. I appreciate that. I'm responding to your statement that they couldn't have been surprised. Yes, and I understand on the joint venture argument, I understand what you're saying. All I'm saying is that in the context of that, my clients in the SEC proceedings and in the D.C. Circuit Court of Appeals said that the parties had an agreement to split the whistleblower work. They were always consistent in that regard. So that's why the breach of contract, whether it's an express contract or an implied contract, I think could not have been a surprise. I appreciate what you're saying. And what I'm trying to do, the term joint whistleblower meant something different there than it does here. And for there, from the SEC's perspective and even Mr. Mittman's writings, it meant 50-50, which was not ever the concept. You've answered my question. Thank you. Let me ask you, speaking of joint ventures, I'm trying to figure out why did Mr. Mittman owe a fiduciary duty to your clients in 2015 despite leaving the Johnson Group the year before? Because earlier, and as alleged in the complaint, the parties agreed that they would continue pursuing the SEC investigation and then ultimately the joint whistleblower application as a team, as a joint venture. And when they agreed to pursue it as a team, as a joint venture, that created the fiduciary duty. And so I guess to the next question, what is your best authority to support that working together on a whistleblower application is a joint venture that creates this fiduciary obligation? Sure. The California law on joint ventures and partnerships isn't terribly different. So the cases that we cited for you about partnership, joint venture, they're very similar. The blend shows that there's almost no distinction. And so when parties agree that they are going to do something together, and most of the joint venture cases are real estate cases, but when the parties agree. So what case do you think is the most directly on point? Because I couldn't find any authority that I thought was directly on point. I know that the law states that a joint venture requires a community of interest, that is, a joint interest in a common business undertaking and understanding as to the sharing of profits and losses and a right of joint control. I think that was the Connor versus Great Western Savings or Great Savings. But it seems like Paragraph 40 of your First Amendment complaint might just undermine the idea that the whistleblower application was a business undertaking. And I just wanted to give you the opportunity to respond to that. All right. So I'm looking at Paragraph 40, Your Honor, of the First Amendment complaint, and it says, Though not the reason Johnston blew the whistle on Citigroup, the new availability of a bounty became one way for the parties to recover some of the costs. And then it goes into Paragraph 41, which really begins, I think, the discussion of working together to hold Citigroup accountable. And it alleges that the parties agreed that Johnston would file a single whistleblower application. So they are operating as the Johnston Group, and they are agreeing to pursue the whistleblower application, and it's for profit, okay? You're relying on what I would think of as vanilla California law regarding joint ventures. But this hasn't been applied in this context, in a whistleblower context, surely. I agree with you, and that is correct. I think vanilla partnership law is exactly what we are relying on. I interrupted your response to Chief Judge McGeeh's question. Go ahead. Yeah, when you asked me, what is the law that says that there is a fiduciary duty in a joint venture, I don't think the parties briefed the issue because the issue below was whether or not there was control. So I don't think that that was the issue that the district court was struggling with. The issue was whether there was joint control, and we were citing cases that talk about how it doesn't need to be equal and how control can be delegated. So can you go to that point, which is what the district court relied upon? Because I'm not sure if you're going to be able to show a joint venture or not under vanilla, what I'm calling vanilla, existing California law on joint ventures. But the district court was concerned that you'd pleaded yourself out of it. That's my paraphrase, I think, because there was indication in the email traffic that your client had requested access, I think, to the application and hadn't been granted and later was granted. You know what I'm referring to? Yeah, the December 5, 2015 email. So can you tell me why you think that was not an adequate reason for the court to rule as a matter of law that there isn't a joint venture? Sure. It wasn't a joint venture? Sure. So I think it's a merits-based decision to look at a single email and determine that there's no adequate split of control. Can a joint venture be formed? Can the joint control that you're referring to, which I think is an element to the vanilla cause of action, be evidenced by delegation of authority? Absolutely. And if you really look at the email, if you look at the very last paragraph, my client invites Mr. Mittman to contribute more to the application. And it's important to understand the timing of that email. That is at the finish line. This application must be filed in December. They have very little time to make any changes. And so the first three quarters of the email, Mr. Mittman is asking for information. He wants to see things. And at the tail end, my client pushes him back a little bit, but then he says, Hey, if you have some edits, please let me know and we'll look at them. So it's not a complete I'm ignoring you. He's inviting him at the end. But more importantly, I think it's unfair to look at a single email at a complaint stage and say, Well, that's enough. I've determined that there's no adequate joint or delegation of control. Your client's assertion and version of events, again, we're just here at the outset and we're not finders of fact, but I think your client's version of events is that he was the leader of your three musketeers analogy. Yes. I don't remember which musketeer was the leader, so I won't name him. But that's your client's version of events, that that was true during the SEC action, the FINRA action, and that he had taken the lead this time as well. Yes. All throughout. That's correct. And the concept is, as I understand the Dodd-Frank law, whistleblower applications must be filed by a single person. Right. And in the application, Mr. Johnston said he was filing it on behalf of the Johnston group. What's your client's strongest allegation that would support the notion that the court could find joint control for purposes of a joint venture? That the parties agreed that they would work together to prepare the application. Okay, and so the district court was, forgive me for interrupting, the district court was concerned that that e-mail that you're talking about, the December 15th e-mail, does not evidence a joint cooperative. It evidences that your guy's taking the lead. Hence my question, do we have California case law establishing the proposition that the joint and cooperative nature can be, that that element can be satisfied if one party to the joint venture delegates the lead role to another party? The answer is yes. And I will give you the case. It's the Orozco case. It says joint control for purposes of a joint venture need not be equal and may be delegated. So with respect to the breach of implied, well, actually I want to finish on the breach of oral contract claim. Did you want to reserve any time? Oh, yes, I reserved three minutes. We're well beyond that. I'm sorry. Then I will stop talking. Okay. Thank you. Good morning. May it please the Court. Justin Scherr on behalf of the defendant appellee Michael Mittman. It's important to note in this case what is not in the amended complaint that's the subject of this appeal. There is no factual allegation that the three parties, Mittman, Johnston, and Arnold, got together and discussed how they were going to allocate the whistleblower award if they ever got one. Well, I thought there was an understanding. The allegation is that there was an understanding that they used the same operating principle that they had used while they were practicing together. Basically an eat what you kill kind of an agreement. So they do drift back into this allegation, which was more part of their first complaint, that there's a get out what you put in agreement that lasted through the life of their working together. Isn't it the fact that the complaint alleges, what we've got in front of us, is that that is in fact how the parties proceeded in their earlier course of dealings? Not just they talked about it, but they did it. I think that's a fair characterization. So there was a period when they were working together at the same company during which there was this perhaps general principle, again, assuming the allegations are true. Right, which we have to do. Correct, that there was a general principle of some kind of get out what you put in. But that agreement, implied in fact agreement, which is what they relied on in the first complaint, was formed at a time when the Dodd-Frank Act hadn't even passed. There was no statute. But even if you were to say, okay, that carried through. Can I interrupt you? Of course. Just since you're proceeding chronologically, forgive me for interrupting you. But there was the earlier action, right? There's the reporting to the SEC. There's a FINRA action. Correct. And Dodd-Frank was, I mean, I appreciate, I think the allegation is that this was launched, this effort was launched prior to passage of Dodd-Frank. And, of course, it was Dodd-Frank that ushered in the bounty whistleblower. Right. So why isn't there a preexisting course of conduct between these three that predated Dodd-Frank? There is, yes, Your Honor. Okay. So what am I missing then? So I think to say that there's an agreement to get out what you put in, it is not an enforceable agreement. It doesn't work. And here's why. There was a FINRA arbitration where they used one formula, a certain percentage. I think it was 4 percent Mr. Mittman got. Then there was costs of cooperating with the SEC in the SEC investigation. I think Mr. Mittman paid 10 percent of that process. That's what I have. Yep. Yeah. And then there's this separate process after they're no longer working together of submitting a whistleblower application and the plaintiffs allege that there's a brand new formula that hadn't been previously applied of 4.12 percent that Mr. Mittman is supposed to get. Well, you're talking about what filtered out on the back end of the formula. His allegation, no idea if he can prove it, his allegation it was the same formula, but because the formula is that you get out what you put in and there are different inputs, then the back end percentages are going to differ somewhat. So why is that inconsistent? I think if you interrogate that concept, I don't think it works because how do you determine how much everybody puts in? Well, there are entire partnerships that operate on eat what you kill kind of very loose agreements. So why not here? Again, I don't know if they can prove it, but you're asking us to rule as a matter of law this could not have existed. Correct, Your Honor. Because? So I think an eat what you kill concept is what kind of revenue you're bringing into the company. That's not going to change by the time there's a lawsuit. Well, why not, for example, just to play devil's advocate, why not that since you get out what you put in that the parties would have, after the fact, assessed the number of hours they all put in and compensated, you know, divided the pie accordingly? Sure. I just think that's a much more complicated agreement that required some factual allegations that we got together and discussed this is what we're going to do, and you're saying that we always had this very general principle of getting out what you put in. That's not an enforceable agreement, and I'll make one more point, Your Honor. So, sorry, just to pick up on that point. So you think it would be unenforceably vague to put this into contract terms as a matter of law? Correct, and I'll give you an example. With respect to Mr. Mittman's whistleblower application, he put 100 percent of his time and money into that application. How did he even reach this agreement? By getting 100 percent back from his own efforts to submit his whistleblower application. He didn't get anything. I assume that's a rhetorical question because you know what their theory is, that their agreement was that they wouldn't be doing that, they'd be working jointly. Right, but that's a different agreement. I think my point is, Your Honor, that if it's simply get out what you put in, it's not clear how Mr. Mittman would have breached that agreement and the facts that are alleged. All right. What you need, what they need to allege is that they got together and they reached an agreement that only Mr. Johnson's going to file a whistleblower application, Mr. Mittman is not, and there's no factual allegation that they even discussed the question about Mr. Mittman's ability to file his own whistleblower application. So I think if you assume all the facts to be true, what you end up with is an allegation that Mr. Johnson and Mr. Arnold expected that Mr. Mittman would go along with Mr. Johnson's plan of filing his own whistleblower application and controlling how any potential whistleblower award got distributed. And by the way, a whistleblower application has to be filed on behalf of an individual. Okay. So essentially what their narrative is, is that they expected Mr. Mittman to allow Mr. Johnson to continue to control this process even though they were no longer working together. And so they were ultimately surprised when they learned that Mr. Mittman filed his own whistleblower application and they were disappointed, of course, that... Do you think a fact finder couldn't look at the December 15th email and decide that that does evidence and awareness between the three of them that they were going to continue to operate on the same basis? I think it does not demonstrate an agreement. I think what they used that email to suggest is that there was some fraudulent representation, and I'm happy to go into the fraud claim, but I think that's how the email is relevant to their allegations. Let me ask you, I wanted to give you an opportunity to explain how the alleged oral contract is materially inconsistent with prior pleadings, which was one of the main basis that the district court ruled the way he did in this case. Especially viewing the first amended complaint allegations in the light most favorable to the plaintiff. Yes, Your Honor. So in the first complaint, the only claim that was asserted by the plaintiffs was that there was an implied agreement. An implied agreement is one that can be manifested through conduct. If you get into a taxi before the days of Uber, you tell the driver where you'd like to go, and there's an implied agreement that upon your arrival, you'll pay the driver. Well, they alleged in the original complaint that Johnson, Arnold, and Mittman agreed that they would jointly pursue a whistleblower bounty in order to compensate them jointly for their efforts in blowing the whistle on the city group fraud. Yes. I'm having trouble seeing how the first amendment complaint is inconsistent with the prior pleading. Yes. I think that's a purely conclusory allegation. And when the facts asserted in the first complaint were based purely on this idea that for the period they were working together, they had this get out what you put in concept. There was no allegation and no facts suggesting that the parties got together, they shook hands, they agreed on how to distribute the whistleblower award, or they discussed the fact that Mr. Mittman couldn't file his own whistleblower application. There's nothing like that. All they are alleged in the first complaint, yes, they have the conclusory word agreed in the first complaint. But the court didn't dismiss it on that basis. The court dismissed it because he said if there had been such an agreement, again, I'm paraphrasing, if there had been such an agreement, they would have remembered that, and it would have been in the first complaint. Hence, I think, the Chief's question, which is what's inconsistent in the first amendment complaint with the notion that there was an implied in fact agreement. In other words, it seems that they did allege that, didn't they? Can't you read the first complaint that way? I don't think so because what they argue in the first complaint is that there was an agreement implied by conduct. In the first amended complaint, yes, that claim carries over. But the inconsistency is for the first time in approximately eight years since these events took place, the plaintiffs alleged that there was an express oral agreement because they were concerned that an agreement to file a single whistleblower application under Johnston's name and distribute any potential award according to these 100th percentage allocation is not an agreement that can be implied by conduct like getting in a taxi or going into a restaurant or ordering food and having an implied agreement that you're going to pay the check after your meal is over. This is not a plausible implied agreement that can be manifested through conduct. And even if it were, the plaintiffs haven't alleged what conduct Mr. Mittman engaged in to manifest an agreement of that kind. What about the prior course of dealings between the parties? Why isn't that conduct that manifests, again at this very early stage, why isn't that conduct that a fact finder could rely upon? Again, I think there's nothing in a prior course of conduct where you split things in a general sort of equitable fashion that provides you cannot file your whistleblower application yourself. That's not a term of such an agreement. Could I get you to address the question that Chief Judge McGee asked at the outset, which is your take on whether or not the facts as alleged would allow a finding or a conclusion, would be a legal conclusion, that the parties had a joint venture? Sure. So a joint venture has to be a business enterprise for profit. Applying for a whistleblower award I don't think can be characterized as a business enterprise. I don't know if it can or not. I think it hasn't been. Correct. Right. Not that I'm aware of. I'm sorry? I'm sorry. Not that I'm aware of. Correct. Yeah. Right. So my question is, I think better asked, why couldn't it be that the existing, of course there's California law on what it takes to form a joint venture. Again, we're really early on. I don't know if they can prove this up, but why are the allegations here legally infirm? Sure. I think the case law is clear. You have to do more than conclude your allegations. So simply saying there was a joint venture and joint control is not enough. You have to allege facts that support this. And so they don't allege any facts about Mr. Mittman's joint control of this process. The email that they heavily rely on for their fraud claim provides exactly the opposite. It demonstrates that Mr. Mittman asked, can I please attend the meeting with the attorney that you're using to advise on this whistleblower application that you're planning to file in your name? And the answer he got was no. Right. So hence my question. A fact finder could read it that way, I think, and find that after hearing what the parties have to say about this and considering their testimony. But do you have an answer to the question that I asked earlier that differs perhaps, that California doesn't allow joint control to be established by virtue of delegation by one member of the joint venture? I think the case is correct that you are allowed to delegate your control. I think those are the cases that he cites stands for. I'll tell you, the Orozco case, in that case the court found that there wasn't a joint venture. Yep. But no, do I know of a case that expressly says you cannot demonstrate that lack of joint control through a delegation? No, but to me it doesn't make sense, right? I mean, the evidence that somebody else is taking the lead on something necessarily does not demonstrate that there is joint control. So I don't think that works, but no, I'm not aware of a case. I appreciate your candor. Thank you. Okay. We have three of us sitting here, and it takes two to tank to issue a decision, but we do have one fearless leader for our court. And so you kind of – I mean, we have a situation right here where we have some semblance of joint control, but we have a leader, too. We have somebody presiding and we also have the chief. So I think you can. I mean, there are situations where you – I don't think it's necessarily completely inconsistent to have a form of joint control, but also have a leader of sorts. I agree, Your Honor. I don't know if you're suggesting the three of you are in a joint venture. I want to cut in on that. It took me a while to figure that out. We'll figure that out afterwards. But for the particular vehicle of a joint venture, you do need to demonstrate or at least allege joint control. The plaintiffs have not alleged those facts here. And on top of that, before the D.C. Circuit, they affirmatively said there was no joint venture because Mr. Johnson had all the control. Now, that was actually not particularly relevant to the issue before the D.C. Circuit, but they were trying to analogize the question of whether Mr. Mittman satisfied the statutory criteria of a joint whistleblower by comparing it to the standards for a joint venture under California law. And they affirmatively said we didn't have one. So I don't think you can – giving all the benefit to the plaintiffs in this case, I don't think you can ignore these documents that they referenced in the complaint and submitted in other proceedings. Thank you, Your Honor. Thank you. Counsel stated that the allegations about the parties' agreement were too vague. Instead, they're very specific regarding the splits and each party's obligations. Paragraph 41 of the first amendment complaint specifically says that the parties agreed that Mr. Johnson would file the single application. So that wasn't something that you have to infer from the first amendment complaint. It's in the first amendment complaint. With regard to the argument that the original complaint did not put them on notice of an oral agreement, at least paragraph 36 of the original complaint says that the parties pursued their remedies against Citigroup as a team and subject to an implied agreement manifested by words, conduct, and a course of dealing. So, again, I don't think that you have to be perfectly precise in a complaint to withstand a motion to dismiss. There is nothing inconsistent with the amended complaint and the original complaint with respect to the oral contract and to the extent that there are things that are vague or this court finds are missing, we can amend. Thank you. Counsel, were you just reading from paragraph 36? The original complaint. Oh, no wonder. Okay. Thank you. I've got the other complaint. Yes, I was trying to respond to the question about whether there was anything in the original complaint that used something that would indicate it was oral. Thank you. Thank you. Mr. Wilson and Mr. Scherer, thank you very much for your oral argument presentations here today. The case of John Arnold-Michael Johnson v. Michael Mittman is now submitted. That concludes our oral argument calendar for today, and so we are adjourned. Thank you very much. All rise.
judges: MURGUIA, CHRISTEN, VANDYKE